IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Case No. 1:07cv00589 |
| MICHELLE PREISS, individually | ) |
| and d/b/a "Tax Max" and | ) |
| "Preiss Tax Service"; MICHAEL | ) |
| EDWARDS; and SHERYL LESTER, | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM OPINION AND
ORDER OF PERMANENT INJUNCTION**

SCHROEDER, District Judge

    This matter comes before the court on the "Motion for Clerk's
Entry of Default and Default Judgment Against Defendant Lester"
filed by the United States. (Doc. 12.) Defendant Sheryl Lester
("Lester") was properly served and has failed to appear in this
action. On April 4, 2008, the Clerk entered a default against
Lester under Federal Rule of Civil Procedure 55(a). (Doc. 14.)
Upon consideration of the motion, the record and the applicable
law, the court makes the following findings of fact and conclusions
of law and enters judgment by default and a permanent injunction
against Lester.

**I.    FINDINGS OF FACT**

    The court finds that Lester failed to answer or otherwise
respond to the "Complaint for Permanent Injunction and Other

Relief" (Doc. 1) and is therefore in default. Taking the allegations in the Complaint as true, the Court finds as follows:

1.   At the time of the filing of the Complaint, Michelle Preiss resided in East Bend, North Carolina.  (Id. ¶ 4.)

2.   Since 2003, Preiss has owned and operated a tax-return-preparation business called "Tax Max."  (Id. ¶ 5.)

3.   In October 2002, Preiss applied for and received an IRS electronic filing identification number under the business name "Preiss Tax Service."  (Id. ¶ 6.)

4.   Through Tax Max, Preiss has been preparing and electronically filing federal income tax returns for individuals residing in North Carolina, Virginia and West Virginia.  (Id. ¶ 7.)

5.   At the time of the filing of the Complaint, Michael Edwards resided with Preiss in East Bend, North Carolina.  (Id. ¶ 8.)

6.   At the time of the filing of the Complaint, Sheryl Lester resided in Pineville, West Virginia.  (Id. ¶ 9.)

7.   Edwards and Lester have performed services for Tax Max for compensation.  (Id. ¶ 10.)

8.   Since early 2005, Preiss, Edwards and Lester have been participating in a scheme to file false federal income tax returns requesting earned income tax credits and income tax refunds to which Tax Max customers are not entitled.  (Id. ¶ 11.)

2

9. Specifically, tax returns filed by Preiss on behalf of Tax Max customers contain fictitious or inflated amounts of gross business receipts on their Schedules C and report no business expenses, which results in false or inflated requests for earned income tax credits and income tax refunds. (Id. ¶ 12.)

10. Preiss and Edwards have attempted to recruit single, uneducated, low-income women with children to become customers of Tax Max. (Id. ¶ 13.)

11. Preiss and Edwards recruit such individuals at public housing projects, unemployment offices and welfare offices. (Id. ¶ 14.)

12. Edwards has stated that he targets these individuals as potential customers because they do not ask many questions about the information reported on their tax returns. (Id. ¶ 15.)

13. Edwards trained Lester regarding how and why to recruit such individuals as customers for Tax Max. (Id. ¶ 16.)

14. Edwards instructed Lester to target, as potential Tax Max customers, individuals who receive disability or social security benefits and who are not required to file income tax returns. (Id. ¶ 17.)

15. Edwards explained to Lester that the defendants would not get caught filing false Schedules C if they reported business income amounts less than $10,000 so that, if questioned, Tax Max

3

customers could claim the receipts were cash income, and no one could prove or disprove that claim. (<u>Id.</u> ¶ 18.)

16.  Lester recruits customers for Tax Max in West Virginia. (<u>Id.</u> ¶ 19.)

17.  Lester obtains the personal information (e.g., names, addresses, and social security numbers) of potential West Virginia customers and relays that information to Preiss in North Carolina. (<u>Id.</u> ¶ 20.)

18.  Preiss prepares and electronically files federal income tax returns for customers reporting fabricated or inflated business revenue and no business expense deductions. (<u>Id.</u> ¶ 21.)

19.  Lester travels from West Virginia to North Carolina to retrieve copies of the electronically filed tax returns, tax refund checks and unsigned copies of IRS Form 8453 (U.S. Individual Income Tax Declaration for an IRS e-file Return) for Tax Max customers in West Virginia. (<u>Id.</u> ¶ 22.)

20.  Lester then returns to West Virginia to provide the checks to the customers residing there. She also then obtains the customers' signatures on the Forms 8453 consenting to allow Tax Max to file the returns electronically. (<u>Id.</u> ¶ 23.)

21.  Preiss has already electronically filed the West Virginia customers' tax returns by the time Lester obtains their consents to electronic filing on Forms 8453. (<u>Id.</u> ¶ 24.)

4

22.   Preiss charges her customers between $300 and $900 per tax return she prepares through Tax Max.  (Id. ¶ 25.)

23.   The amount of Preiss's fee increases as the tax refund amount received by the customer increases.  (Id. ¶ 26.)

24.   Preiss shares the fees she collects with Edwards and Lester.  (Id. ¶ 27.)

25.   On the evening of March 29, 2006, special agents of the IRS Criminal Investigation Division met with Preiss and Edwards to discuss Lester's involvement with Tax Max.  (Id. ¶ 28.)

26.   Later that night, Preiss and Edwards called Lester, informed her of their meeting with the IRS agents, told her not to talk over the telephone, and said they were driving to West Virginia to tell Lester what to say to the IRS agents.  (Id. ¶ 29.)

27.   At approximately 4 a.m. on March 30, 2006, Preiss and Edwards met with Lester in the parking lot of a convenience store in Pineville, West Virginia.  (Id. ¶ 30.)

28.   During this meeting on March 30, 2006, Edwards instructed Lester to tell IRS agents that (a) Tax Max customers provided Lester with their occupations and the amounts of business income they earned; (b) Lester prepared the customers' tax returns on her computer; and (c) Preiss and Edwards reviewed the returns prior to Lester obtaining the customers' signatures on the returns, which occurred before the returns were filed.  (Id. ¶ 31.)

5

29.  The information that Edwards instructed Lester to give to the IRS agents is false.  (Id. ¶ 32.)

30.  Edwards told Lester that as long as she stuck to this story, and all three defendants had the same story, they would not get in trouble.  (Id. ¶ 33.)

31.  The IRS has reviewed a sample of twenty-five federal income tax returns prepared and filed by Preiss through Tax Max for tax years 2004 and 2005.  (Id. ¶ 34.)

32.  Most of these customers did not need to file federal income tax returns because their only real income was from social security disability or retirement payments.  (Id. ¶ 35.)

33.  All twenty-five reviewed tax returns contained false amounts of gross business receipts on Schedule C, which resulted in improper earned income tax credits and tax refunds.  (Id. ¶ 36.)

34.  The average false refund from these twenty-five tax returns was approximately $1,800.  (Id. ¶ 37.)

35.  Through Tax Max, Preiss prepared and filed approximately 140 tax returns for tax years 2004 and 2005 that included Schedules C.  (Id. ¶ 38.)

36.  Therefore, the IRS estimates that this scheme cost the United States Treasury approximately $250,000 in lost revenue for tax years 2004 and 2005.  (Id. ¶ 39.)

6

37.  In June 2007, Preiss, Edwards and Lester entered into separate plea agreements with the Office of the United States Attorney for the Southern District of West Virginia.  (<u>Id.</u> ¶ 40.)

38.  In those plea agreements, Preiss, Edwards and Lester admitted to conspiring to defraud the United States, in violation of 18 U.S.C. § 371, through the aforementioned scheme.  (<u>Id.</u> ¶ 41.)

## II.  CONCLUSIONS OF LAW

The court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1340 and 1345 (2006) and 26 U.S.C. §§ 7408 and 7402(a) (2002 & Supp. 2008).  The court also enters the following conclusions of law:

### A.  Default Judgment

The entry of a default judgment is committed to the sound discretion of the district court.  <u>Papagianakis v. Samos</u>, 186 F.2d 257, 263 (4th Cir. 1950).  A court may enter a default judgment if (1) a party fails to plead or otherwise defend against a complaint, and (2) the clerk has entered that party's default.  Fed. R. Civ. P. 55(b)(2).  Lester was properly served and has failed to file an answer or otherwise respond to the United States' motion.  On April 4, 2008, the Clerk properly entered a default against Lester under Federal Rule of Civil Procedure 55(a).  (Doc. 14.)

Upon entry of default, the well-pleaded allegations of the complaint are taken as true.  Fed. R. Civ. P. 8(b)(6) ("An allegation . . . is admitted if a responsive pleading is required

7

and the allegation is not denied."); <u>Ryan v. Homecomings Fin.</u> <u>Network</u>, 253 F.3d 778, 780 (4th Cir. 2001) ("The defendant, by [her] default, admits the plaintiff's well pleaded allegations of fact[.]" (citation omitted)).  A default does not however admit to conclusions of law, <u>Ryan</u>, 253 F.3d at 780, or allegations as to the amount of damages, <u>SEC v. Marker</u>, 427 F. Supp. 2d 583, 586 (M.D.N.C. 2006), though the latter are not an issue in this action because the United States seeks injunctive, not monetary, relief.

Furthermore, "[a] default judgment must not differ in kind from . . . what is demanded in the pleadings."  Fed. R. Civ. P. 54(c).  Here the United States seeks the same relief requested in the Complaint:  a permanent injunction against Lester, as well as full post-judgment discovery to monitor her compliance with the injunction.  (<u>Compare</u> Doc. 1 at 12, 13 <u>with</u> Doc. 12 at 7.)  Thus, a default judgment is appropriate in this action.

**B.    Permanent Injunction**

The United States asserts that Lester has violated section 6701 of the Internal Revenue Code.  To prevent Lester from continuing these prohibited activities, the United States filed this action to obtain a permanent injunction against her pursuant to sections 7408 and 7402 of the Internal Revenue Code.  (Doc. 1 ¶¶ 3, 49-54, 55-58, 59.)

In the federal courts, absent circumstances described below, the imposition of permanent injunctive relief requires a showing of

irreparable injury and inadequacy of a legal remedy. <u>Weinberger v.</u>
<u>Romero-Barcelo</u>, 456 U.S. 305, 312 (1982). The U.S. Supreme Court
recently reaffirmed the traditional equitable factors required to
obtain a permanent injunction:

> A plaintiff must demonstrate: (1) that it has suffered
> an irreparable injury; (2) that remedies available at
> law, such as monetary damages, are inadequate to
> compensate for that injury; (3) that, considering the
> balance of hardships between the plaintiff and defendant,
> a remedy in equity is warranted; and (4) that the public
> interest would not be disserved by a permanent
> injunction.

<u>eBay Inc. v. MercExchange, L.L.C.</u>, 547 U.S. 388, 391 (2006); <u>accord</u>
<u>Christopher Phelps & Assocs., LLC v. Galloway</u>, 492 F.3d 532, 543
(4th Cir. 2007). "The decision to grant or deny permanent
injunctive relief is an act of equitable discretion by the district
court." <u>eBay</u>, 547 U.S. at 391.

"An injunction may issue without resort to the traditional
equitable prerequisites if a statute expressly authorizes the
injunction." <u>Abdo v. IRS</u>, 234 F. Supp. 2d 553, 564 (M.D.N.C.
2002), <u>aff'd</u>, 63 Fed. App'x 163 (4th Cir. 2003); <u>see also</u> <u>United</u>
<u>States v. Buttorff</u>, 761 F.2d 1056, 1059 (5th Cir. 1985) ("When an
injunction is explicitly authorized by statute, proper discretion
usually requires its issuance if the prerequisites for the remedy
have been demonstrated and the injunction would fulfill the
legislative purpose." (internal quotation marks omitted)). Because
the United States bases its motion on two provisions of the
internal revenue laws, 26 U.S.C. §§ 7408 and 7402(a), the court

9

must determine if these statutes contain sufficiently express congressional authorizations for the issuance of a permanent injunction against Lester.  These statutory provisions are analyzed separately because each has different language governing the grant of injunctive relief.

### 1.  Section 7408

Section 7408 empowers the United States to commence an action in a district court to enjoin any person from further engaging in conduct proscribed by section 6701 of the Internal Revenue Code. 26 U.S.C. § 7408(a), (c)(1).  Section 7408 expressly authorizes a court to grant a permanent injunction if it finds (1) "that the person has engaged in any . . . conduct" subject to penalty under section 6701; and (2) "that injunctive relief is appropriate to prevent recurrence of such conduct."  Id. § 7408(b), (c)(1). Because section 7408 sets forth specific criteria for injunctive relief, the United States need not establish the traditional factors for equitable relief.[1]  United States v. Estate Pres. Servs., 202 F.3d 1093, 1098 (9th Cir. 2000); Abdo, 234 F. Supp. 2d at 564.

### a.  Violation of Section 6701

The United States must show that Lester violated section 6701. Section 6701 imposes a penalty on any person:

---

[1] As discussed in Section II.B.2.d, infra, even if these factors applied to this action, they would still support injunctive relief.

10

> (1) who aids or assists in, procures, or advises with respect to, the preparation or presentation of any portion of a return, affidavit, claim, or other document,
>
> (2) who knows (or has reason to believe) that such portion will be used in connection with any material matter arising under the internal revenue laws, and
>
> (3) who knows that such portion (if so used) would result in an understatement of the liability for tax of another person[.]

Id. § 6701(a).

Based on the foregoing findings of fact, Lester has engaged in conduct that is subject to penalty under section 6701. Lester has aided or assisted in the preparation of tax returns through her (1) recruitment of potential Tax Max customers; (2) delivery of these customers' personal information to Tax Max; (3) retrieval and delivery of electronically filed tax returns, tax refund checks and unsigned copies of IRS Form 8453 to these customers; and (4) acquisition of customers' signatures on the Forms 8453, which allows the electronic filing of the tax returns. (Doc. 1 ¶¶ 19-23.) Lester also knew, or had reason to believe, that these returns would be used in connection with a material matter arising under internal revenue laws and would result in an understatement of tax liability because she was trained to recruit customers who were not required to file income tax returns. (Id. ¶¶ 11-18.) She was even told how Tax Max could minimize the likelihood of prosecution for filing false returns by making the false claims

11

less readily apparent.  (Id. ¶ 18.)  Thus, the United States has satisfied the first statutory element of section 7408.

### b.  Recurrence of Prohibited Conduct

The United States also must show that a permanent injunction is reasonably likely to prevent recurrence of the prohibited conduct.  Courts "assess the totality of the circumstances" in determining whether to grant such an injunction.  In particular, courts weigh the following five factors:  (1) "the gravity of harm caused by the offense"; (2) "the extent of the defendant's participation and . . . [her] degree of scienter"; (3) "the isolated or recurrent nature of the infraction and the likelihood that the defendant's customary business activities might again involve . . . [her] in such transactions"; (4) "the defendant's recognition of . . . [her] own culpability"; and (5) "the sincerity of . . . [her] assurances against future violations." Abdo, 234 F. Supp. 2d at 564 (internal quotation marks and citations omitted); United States v. Kotmair, No. WMN-05-1297, 2006 U.S. Dist. LEXIS 96885, at *18-20 (D. Md. Nov. 29, 2006), aff'd, 234 Fed. App'x 65 (4th Cir. 2007); United States v. Lloyd, No. 1:04CV00274, 2005 U.S. Dist. LEXIS 32747, at *22-24 (M.D.N.C. Dec. 5, 2005), aff'd, 187 Fed. App'x 282 (4th Cir. 2006).

On balance, these five factors weigh in favor of a permanent injunction.

12

## (1)  Gravity of Harm

This factor strongly favors the United States.  To determine the gravity of harm, courts often assess the financial impact of the returns in terms of lost revenue, the costs of recovering overpayments, and the costs of investigating the prohibited activities, among other things.  Lloyd, 2005 U.S. Dist. LEXIS 32747, at *22-23 (finding that significant harm resulted from the filing of frivolous returns because the federal government likely could not collect back taxes, penalties and interest from the filers and, even if it could, "the process of identifying, auditing and collecting these taxes . . . [would] be costly and burdensome"); Abdo, 234 F. Supp. 2d at 565 (finding significant harm when the defendant filed over 200 tax returns, created at least $243,000 in understated tax, and caused the Internal Revenue Service to spend valuable time investigating those tax returns); United States v. Bailey, 789 F. Supp. 788, 816-17 (N.D. Tex. 1992) (finding that the gravity of the harm is demonstrated by the large number of returns prepared over several years, that these returns drain the administrative resources of the government, and that much of the lost revenue was unrecoverable).

In this action, the tax scheme caused significant harm to the United States Treasury and the taxpaying public by interfering with the proper administration of the internal revenue laws.  Tax Max filed approximately 140 false returns that are estimated to have

13

"cost the United States Treasury approximately $250,000 in lost revenue for tax years 2004 and 2005." (Doc. 1 ¶¶ 38-39.) The United States has not presented any express evidence regarding the costs of recovering overpaid refunds or investigating this tax scheme. However, the record implicitly suggests that the United States is unlikely to recover the refunds from individual Tax Max customers, given the sheer number of customers, the lapse of time since the false claims and refunds, and the socioeconomic status of the customers. (Id. ¶¶ 11, 13-17, 38, 39.) Even if the United States could collect these funds, it would likely incur substantial costs and burdens in investigating and collecting the refunds from individual filers.

In addition to the harm to the United States and the general public, Lester's prohibited activities could cause significant harm to Tax Max's customers, who could conceivably face civil or criminal penalties for filing false tax returns. Abdo, 234 F. Supp. 2d at 565.

### (2) Extent of Participation and Degree of Scienter

This factor favors the United States. The record shows that Lester participated in this tax scheme since its inception in early 2005. (Doc. 1 ¶ 11.) Lester recruited customers for Tax Max in West Virginia, obtained their personal information and relayed it to the tax preparer in North Carolina. (Id. ¶ 19-20.) She also retrieved copies of the tax returns, refund checks and other

14

documents from North Carolina and delivered them to Tax Max customers in West Virginia. (<u>Id.</u> ¶ 22.) Furthermore, Lester obtained the customers' consent for the electronic filing of the false tax returns. (<u>Id.</u> ¶ 23.)

Though Lester was not an owner of Tax Max, was not the mastermind of the tax scheme, did not personally prepare or file any false returns, and had no input on the amount of "fabricated or inflated business revenue" reported on the returns (<u>id.</u> ¶¶ 5, 7, 12, 13-18, 21, 24, 34, 38), she played a subordinate yet undeniably integral role in the scheme. Lester followed instructions of other employees, recruited customers for the scheme, and received a share of the ill-gotten gains. (<u>Id.</u> ¶¶ 16-18, 27, 29-33.) While the record is silent on the number of hours per week that Lester devoted to this tax scheme and does not identify the number of returns or amount of revenue attributable to customers recruited by her, it indicates that Tax Max prepared and filed approximately 140 false returns and estimates that the scheme "cost the United States Treasury approximately $250,000 in lost revenue." (<u>Id.</u> ¶¶ 34, 36-39.)

Lester possessed the requisite degree of scienter under this factor. She knew of the illegality of this tax scheme because she was trained to recruit customers for income tax preparation services who were not required to file returns. (<u>Id.</u> ¶¶ 11-18.) She was also instructed on how Tax Max could minimize the risk of

15

prosecution by crafting tax returns that would make the false claims less readily apparent. (<u>Id.</u> ¶ 18.) In addition, Lester entered a plea agreement admitting that she conspired to defraud the United States. (<u>Id.</u> ¶¶ 40-41.) Thus, Lester clearly knew that her participation in the scheme was wrong and illegal.

### (3) Isolated or Recurrent Nature of Infraction and Likelihood of Future Infractions

This factor slightly favors the United States. Lester participated in a tax scheme starting in early 2005 that spanned two tax years: 2004 and 2005. (<u>Id.</u> ¶¶ 11, 34, 38, 39.) The undisputed record reveals that the scheme encompassed the filing of approximately 140 false returns. (<u>Id.</u> ¶ 38.) Based on the duration of the scheme and the number of returns, this scheme was not merely an isolated event. Moreover, while Lester was not the mastermind of this tax scheme, she played an important subordinate role by recruiting customers from West Virginia without which the scheme could not have been fulfilled. (<u>Id.</u> ¶¶ 19-20.) When the scheme came to the government's attention, she also participated in (and the record reveals at least did not repudiate) a meeting to discuss how to evade the IRS investigation through deception. (<u>Id.</u> ¶¶ 31-33.) This suggests that the likelihood of future infractions, though tempered by Lester's plea agreement, cannot be ruled out.

16

### (4) Recognition of Culpability

Lester has recognized her culpability in this tax scheme. In a related criminal prosecution, she entered a plea agreement with the Office of the United States Attorney for the Southern District of West Virginia. (Id. ¶ 40.) Although Lester apparently did not concede any violations of section 6701 in the plea agreement, she "admitted to conspiring to defraud the United States" through this scheme. (Id. ¶ 41.) Thus, even though Lester has not acknowledged her culpability before this court, this factor favors Lester.

### (5) Sincerity of Assurances against Future Violations

In considering this factor, courts often assess whether a defendant has acknowledged the illegality of her conduct, contested the prosecution, denied the factual allegations, or continued the prohibited activity after a court order or injunction. Lloyd, 2005 U.S. Dist. LEXIS 32747, at *24; Abdo, 234 F. Supp. 2d at 566; Bailey, 789 F. Supp. at 818. As discussed above, Lester acknowledged the illegality of her conduct in an earlier criminal prosecution. (Doc. 1 ¶¶ 40-41.) She also has neither contested this civil prosecution nor denied the allegations set forth in the Complaint. The record contains no indication that Lester has engaged in these prohibited activities since entering the plea agreement. By the same token, Lester has not admitted to the allegations of this action or independently assured this court that

17

she would refrain from engaging in any future violations.  This factor therefore favors the United States slightly.

Based on the totality of the circumstances, a permanent injunction is appropriate to prevent Lester from engaging in prohibited conduct.

### 2.  Section 7402

Section 7402 also authorizes a court to issue injunctions "as may be necessary or appropriate for the enforcement of the internal revenue laws."  26 U.S.C. § 7402(a).  This remedy is "in addition to and not exclusive of any and all other remedies of the United States in such courts or otherwise to enforce such laws."  Id.

Although the statute authorizes entry of a permanent injunction under section 7402(a) whenever such relief is "necessary or appropriate," a fundamental disagreement pervades the case law concerning the appropriate legal standard for injunctive relief under this statutory provision.  To determine whether to grant injunctive relief, various courts have required the United States either to (1) demonstrate the presence of all traditional equitable factors; (2) meet certain traditional equitable factors; or (3) satisfy the "necessary and appropriate" requirements of section 7402(a), without meeting any of the traditional equitable factors.

### a.  All Traditional Equitable Factors

Several courts have held that section 7402(a) requires the United States to prove the traditional equitable factors for the

18

issuance of an injunction. <u>United States v. Ernst & Whinney</u>, 735 F.2d 1296, 1301 (11th Cir. 1984); <u>United States v. Pugh</u>, No. 1:07-cv-02456-NGG-VVP, 2007 U.S. Dist. LEXIS 84385, at *21-22 (E.D.N.Y. Nov. 14, 2007); <u>United States v. Covey</u>, No. 1:05-cv-00487-EJL, 2007 U.S. Dist. LEXIS 75141, at *8-9 (D. Idaho Oct. 9, 2007); <u>United States v. Tanner</u>, No. C06-1139RSL, 2007 U.S. Dist. LEXIS 31884, at *5 (W.D. Wash. Apr. 30, 2007); <u>United States v. Perkins</u>, No. 2:06-CV-00249-LKK-DAD, 2007 U.S. Dist. LEXIS 8517, at *12-13 (E.D. Cal. Jan. 18, 2007); <u>United States v. Hansen</u>, No. 05cv0921-L(CAB), 2006 U.S. Dist. LEXIS 54496, at *31-32 (S.D. Cal. June 1, 2006), <u>aff'd</u>, 2008 U.S. App. LEXIS 10315 (9th Cir. May 6, 2008); <u>United States v. Rosamond</u>, No. 04-863-D-M3, 2005 U.S. Dist. LEXIS 12398, at *3 (M.D. La. Apr. 19, 2005).

### b. Certain Traditional Equitable Factors

Other courts have ruled that section 7402(a), by its express but limited terms, excuses the United States from having to prove certain traditional equitable factors. For example, courts have held that "when an injunction is expressly authorized by statute, and the statutory requirements are satisfied, the [federal government] need not establish irreparable injury in order to obtain injunctive relief." <u>United States v. Frauenkron</u>, No. 99-1777 (PAM/JGL), 2000 U.S. Dist. LEXIS 3997, at *5-8 (D. Minn. Mar. 3, 2000) (holding that section 7402(a) provides express authorization for an injunction); <u>see</u> <u>United States v. Guess</u>, No.

19

04CV2184-LAB (AJB), 2004 U.S. Dist. LEXIS 28463, at *11 (S.D. Cal. Dec. 15, 2004) ("the passage of the statute is itself an implied finding by Congress that violations will harm the public"). Some courts have likewise concluded that the United States need not demonstrate that it has no adequate remedy at law because the injunctive remedy in section 7402(a) is "in addition to and not exclusive of" other remedies. <u>United States v. Rivera</u>, No. CV 03-2520-GHK(JWJx), 2003 U.S. Dist. LEXIS 15823, at *21-22 (C.D. Cal. July 21, 2003).

### c. Necessary and Appropriate

Several courts have held that the United States need not establish any of the traditional equitable factors because section 7402(a) specifically provides for injunctive relief. <u>United States v. Colo. Mufflers Unlimited, Inc.</u>, No. 03-cv-1310-WDM-CBS, 2007 U.S. Dist. LEXIS 24393, at *10 (D. Colo. Mar. 30, 2007) ("[U]pon statutory grant of authority to issue injunctions, the traditional equitable factors, including a showing of irreparable harm, need not be proved."). <u>But see</u> <u>United States v. Webb</u>, No. 06-CV-5317 (SLT)(RER), 2007 U.S. Dist. LEXIS 7307, at *13 (E.D.N.Y. Feb. 1, 2007) ("[U]nlike sections 7407 and 7408, section 7402(a) does not itself authorize specific injunctive relief."). As stated by the First Circuit, "[i]t would be difficult to find language more clearly manifesting a congressional intention to provide the district courts with a full arsenal of powers to compel compliance

20

with the internal revenue laws." Brody v. United States, 243 F.2d 378, 384 (1st Cir. 1957).

Based on this statutory interpretation, courts have to determine only that an injunction is "'necessary or appropriate for the enforcement of the internal revenue laws.'" United States v. Harkins, 355 F. Supp. 2d 1175, 1181 (D. Or. 2004) (quoting 26 U.S.C. § 7402(a) but finding also that traditional equitable factors are satisfied); United States v. Fisher, No. 3:03-CV-2108G, 2004 U.S. Dist. LEXIS 2222, at *26 (N.D. Tex. Jan. 26, 2004); United States v. H&L Schwartz, Inc., No. CV 84-5497 JGD (JRx), 1987 U.S. Dist. LEXIS 14478, at *21 (C.D. Cal. Nov. 10, 1987). This standard is advocated by the United States.

### d. Analysis

The case law reveals inconsistencies among district courts nationwide regarding the appropriate legal standard for injunctive relief under section 7402(a). These inconsistencies appear not only among courts within the same circuit, but also among courts within the same district. Although the Fourth Circuit has not yet addressed whether the United States must demonstrate the traditional equitable factors to warrant an injunction under section 7402(a), its district courts similarly disagree on the appropriate standard.

Many courts have required proof of the traditional equitable factors, Kotmair, 2006 U.S. Dist. LEXIS 96885, at *23-24; Lloyd,

2005 U.S. Dist. LEXIS 32747, at *24-26; United States v. Foster, No. 3:02CV133, 2002 U.S. Dist. LEXIS 22457, at *7-8 (E.D. Va. Oct. 18, 2002); United States v. Hollar, 885 F. Supp. 822, 824-25 (M.D.N.C. 1995). While several other courts declare their adherence to the statutory requirements alone, United States v. Parker, No. 1:05CV00167, 2005 WL 3105339, at *1 (M.D.N.C. Apr. 22, 2005) (preliminary injunction); United States v. Music Masters, Ltd., 621 F. Supp. 1046, 1057-58 (W.D.N.C. 1985); United States v. Sprague, No. 2:85-119-1, 1985 WL 3065, at *1 (D.S.C. Aug. 27, 1985), they often apply the traditional equitable factors as well. Parker, 2005 WL 3105339, at *3; Music Masters, 621 F. Supp. at 1058. Other courts, declining to take a side in this debate, simply apply the more stringent analysis, that is, the traditional equitable factors. United States v. Clarkson, No. 8:05-2734-HMH-BHH, 2007 U.S. Dist. LEXIS 48703, at *10-11 (D.S.C. July 3, 2007); United States v. Green, No. 2:04-CV-329, 2004 WL 3187029, at *1, 3 (E.D. Va. June 30, 2004) (preliminary injunction).

In the present case, because the United States has satisfied all four of the traditional equitable factors in this action, it need not be decided whether a lesser showing is required. First, the United States has suffered an irreparable injury as a result of this tax scheme. This tax scheme is estimated to have "cost the United States Treasury approximately $250,000 in lost revenue," which is unlikely to be recovered. (Doc. 1 ¶¶ 36-39.) The

investigation of the scheme depleted the federal government's limited resources, impaired the efficient administration of the internal revenue laws, and threatens to undermine the integrity of taxpayers' compliance with the nation's tax laws. (Id. ¶¶ 34-39.)

Second, legal remedies are inadequate to compensate for the injury. Although the United States could file actions for monetary damages against individual Tax Max customers, this legal remedy "would entangle the Government in a maze of lawsuits." Music Masters, 621 F. Supp. at 1058 (citation omitted). Furthermore, "[t]he pursuit of such individual remedies would require the expenditure of substantial amounts of limited resources of the IRS and necessarily would not be as effective as enjoining" Lester. Clarkson, 2007 U.S. Dist. LEXIS 48703, at *11 (internal quotation marks and citation omitted). Even if this legal remedy were a feasible alternative, the United States would incur substantial costs and burdens in the investigatory and collection process. Ultimately, the United States is unlikely to collect the false refunds because of the number of filers, lapse of time and socioeconomic status of the customers.

Third, a permanent injunction is warranted by the balance of hardships between the United States and Lester. A permanent injunction is necessary to avoid irreparable injury to the United States, whereas Lester, by contrast, will not sustain any irreparable harm because of an injunction that merely prohibits her

23

from assisting others in making false claims for tax credits and otherwise requires her to abide by the internal revenue laws. _Id._ at *10-11; _Lloyd_, 2005 U.S. Dist. LEXIS 32747, at *25; _Foster_, 2002 U.S. Dist. LEXIS 22457, at *8-9.

Finally, a permanent injunction would serve the public interest. By defrauding the IRS, Lester is in reality defrauding every law-abiding American who, at not insubstantial effort, pays their due to fund the programs of the nation. "[T]he public has a strong interest in minimizing the number of false claims for refunds that are made and in ensuring that tax preparers follow the law in the preparation and submission of tax returns." _Foster_, 2002 U.S. Dist. LEXIS 22457, at *8; _accord_ _Lloyd_, 2005 U.S. Dist. LEXIS 32747, at *25. The public also has a compelling interest in the fair administration and enforcement of the internal revenue laws. A permanent injunction would serve the public interest by preventing Lester from participating in a similar tax scheme in the future.

Thus, based on sections 7408 and 7402(a), the court GRANTS the Motion and permanently enjoins Lester.

**III. ORDER**

Based on the foregoing, the Court ORDERS that:

A. Sheryl Lester and her agents, servants, employees, attorneys, and any persons in active concert or participation with her, are PERMANENTLY ENJOINED from directly or indirectly:

24

1.    Engaging in any conduct subject to penalty under 26 U.S.C. § 6701; i.e., (i) aiding, assisting, or advising others in the preparation of any federal tax forms or documents, (ii) knowing or having reason to believe that the documents will be used in connection with a material matter arising under the internal revenue laws, and (iii) knowing that the documents will (if so used) result in the understatement of the income tax liability of another person;

2.    Engaging in any activity subject to penalty under Title 26 of the United States Code; and

3.    Engaging in any conduct that interferes with the administration and enforcement of the internal revenue laws.

B.    The United States is permitted to conduct full post-judgment discovery to monitor the defendant's compliance with the injunction.

C.    The court retains jurisdiction over this action for purposes of implementing and enforcing the final judgment and any additional orders necessary and appropriate to guard the public interest.

IT IS SO ORDERED.


                                        /s/ Thomas D. Schroeder
                                        United States District Judge

Date:  June 11, 2008